P & M CO. v. AJAX RAIL ANCHOR CO.

(Circuit Court of Appeals, Seventh Circuit. April 10, 1917. On Petition for Rehearing, March 8, 1918.)

No. 2374.

PATENTS ⬦⟶328—VALIDITY AND INFRINGEMENT—RAIL ANCHOR.

The Kramer patent, No. 1,014,155, for a rail anchor, while not a pioneer patent, and limited in scope, was not anticipated, but represents an advancement in the art, which involved invention; also *held* infringed.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Suit in equity by the P & M Company against the Ajax Rail Anchor Company. Decree for defendant, and complainant appeals. Reversed.

Edward Rector and Frank Parker Davis, both of Chicago, Ill., for appellant.

Thomas F. Sheridan and Walter A. Scott, both of Chicago, Ill., for appellee.

Before MACK, ALSCHULER, and EVANS, Circuit Judges.

MACK, Circuit Judge. This is an appeal from a decree of the District Court dismissing the complainant's bill for want of equity. The bill charged the infringement of the Kramer patent, No. 1,014,155, which was granted January 9, 1912, upon an application filed October 18, 1911, for a rail anchor. The claims alleged to be infringed by the defendants are claims 1 and 3, which read as follows:

1. In a device of the class described, the combination with a wedge having a base to extend wholly beneath the rail base and a lateral flange to engage one edge of the rail, of a supporting member having flanges to fit over a rib on said wedge and the other edge of the rail, respectively; said parts having co-operating wedging surfaces arranged for gripping the rail vertically and horizontally.

3. In a device of the class described, the combination with a wedge having a rail supporting base having an inclined surface, a flange to engage one end of the rail, a tie abutment, and a tapering rib inclined horizontally, of a supporting member having a co-operating inclined surface, and flanges to engage

the other rail edge and said rib respectively, the parts being overlapped whereby when said parts are forced together with a rail between them a gripping force will be applied both vertically and horizontally.

The following drawings, taken from appellant's brief, will make clearer the questions involved.

### KRAMER'S CONSTRUCTION.
#### PATENT IN SUIT.

### DEFENDANT'S COMMERCIAL FORM.

The function and development of the rail anchor art is fully considered in Track Specialties v. Barnett, 242 Fed. 633, 155 C. C. A. 323, decided this day. In most anchors in the prior art, the wedging or gripping action is only in one direction, usually horizontal, though in a few instances vertical. The distinctive feature of the patent in suit and of the defendant's structure is the double wedge action, gripping or squeezing the rail not only horizontally at its edges, but vertically on its upper surfaces. This double wedge action, however, is novel neither with the plaintiff's nor with the defendant's assignor, but is first disclosed in the Porterfield patent, No. 968,797. Kramer's claim to invention, therefore, lies, not in the double grip conception but in his specific mode and means of utilizing it.

Kramer's stated objects were "to produce a simple efficient fastener which is easily applied to the rail, and which will act to grip the rail both at its lateral edges in a horizontal direction, and in a vertical

direction, and at the same time maintain an even bearing against the base of the rail," and "to provide a device of the character referred to which will automatically tighten its grip upon the rail as the rail contracts, instead of loosening its grip as in devices of this character heretofore employed."

The patented device consists of the wedge member colored blue, and a co-operating supporting member colored red, in the drawings. The wedge member has a base portion 7, extending beneath the rail base 6 for the entire width thereof, and is provided with an upwardly and inwardly extending rail engaging flange 8. Its base portion 7 is inclined longitudinally, so as to afford means of vertical wedging. The extension of this base portion slightly beyond flange 8 and its termination in a rounded rib 10, which is laterally tapered, make the horizontal gripping possible. The front of the base has a downwardly extending abutment which bears against the tie. The supporting member takes the form of a clamping member or yoke. On one side it has a jaw or flange 18 extending over the opposite edge of the rail from flange 8. On the other side it has another flange 16, which is horizontally inclined to coact with rib 10 to produce the horizontal wedge action. Its middle or base portion 14 runs under the wedge member and has an upper surface inclined so as to co-operate with the under surface of the base of the wedge member for vertical wedging action. "In order to assemble the parts of the anticreeper," following the language of the specifications, "the flange 8 of the wedge member is hooked over one side of a rail base and the abutment 20 positioned against the face of tie 21. The supporting member is then slid in position along the rail with its flange 18 over the opposite edge of the rail base, and until the groove inside the flange 16 passes over the rib 10, said rib and groove co-operating to draw tightly together the (wedge and supporting) members in a lateral direction and thereby, through flanges 8 and 18, and wall 17, gripping the side edges of the rail base between them. By the same operation the relative longitudinal movement of the inclined contacting surfaces on the bases 7 and 14 will effect a vertical wedging action on the edge of the rail base, so that a double wedge is formed, pressing on the edge of the rail and on the bottom of the rail. When the parts have been driven together in position on the rail, any tendency of the rail to 'creep' or move on its bed will tend to increase the tightness of the grip on the rail, and thus effectually prevent its longitudinal movement." An additional vertical wedging action is secured by virtue of the transverse inclination of the coacting surfaces of the base portions of the wedge and supporting members. An automatic adjustment or tightening of the grip upon the rail as it contracts is provided by a locking pin. These two features, however, are immaterial so far as the present infringement suit is concerned.

The defendant's device, which is based upon the Elfborg patents, No. 1,088,976 and 1,083,603, is also composed of two members capable of mutual coaction, whereby the gripping of the rail base both horizontally and vertically is secured. One of the members (that colored blue) has a base portion extending beneath the rail base, the

under surface of which portion is longitudinally inclined to afford a wedge whereby the vertical gripping of the rail may be effected; a flange 8 running along the upper side of one edge and engaging the edge of the rail; on the other edge, a rib 10, extending along the upper surface and horizontally inclined to the axis of the rail; and a depending abutment which bears against the tie. The other member is composed of a flange 18 which hooks over the edge of the rail base opposite the edge engaged by the flange 8; a base portion which extends transversely beneath the member colored blue just far enough to permit a vertical wedging action to be effected by the coaction of its longitudinally inclined upper surface and the similarly inclined under surface of the base member; and a wedge 16 which fits between the rail base and rib 10, the outer vertical edge of which tapers laterally engaging the inner vertical edge of rib 10, so that a horizontal gripping or wedging results as the member colored red is slipped over the other member.

The validity of the patent in suit, unless the claims thereof are very narrowly construed, is attacked on the ground of anticipation, based primarily upon Porterfield, No. 968,797. This is the only earlier double wedge anchor, but in Porterfield both flanges that engage the opposite edges of the rail are on the outer member. The location of one of these flanges 8 and 18 upon each of the anchor members permitting a transverse movement of the flanges relative to each other, not only makes possible a firmer gripping of the rails, but makes the outer member both much better able to resist the downward force exerted against it by the inner member when the abutting foot of the latter is driven against the tie by the creeping action of the rail and less liable to break under this strain. In Porterfield, the inner member, having no flange over an edge of the rail base, derives no direct support therefrom. This very distinction was pointed out by defendant's assignor during the prosecution of Elfborg patent, 1,083,603, in differentiating it from Porterfield. Moreover, in Kramer and in Ajax, the extension of the inner member beneath and in contact with the entire width of the rail base affords a desirable viselike grip not found in Porterfield.

While Wolfe, No. 982,337, locates one flange on each of the two members, neither from his claims nor from his specifications is any double grip conception or action discoverable. And the defendant's assignor successfully argued to this effect in answer to the examiner's reference to Wolfe during the prosecution of the Elfborg patent. To accept the view now urged that one of Wolfe's drawings, being isometric rather than a perspective view, discloses a horizontal wedge, would lead to the absurd conclusion that the rail itself tapers. Wolfe's descriptions and drawings are entirely lacking, in that "substantial representation of the patented improvement in such full, clear, and exact terms as to enable any person, skilled in the art or science to which it pertains, to make, construct, and practice the invention" covered by Kramer; it does not anticipate.

As to infringement, the plaintiff maintains, not only that the basic idea of the patent in suit is found in the Ajax anchor, but that, element

for element, claims 1 and 3 can be read upon the latter device. The defendant denies that the several elements of the claims in suit are responded to in any fair sense in its device; it contends that the function of the two members and in the two devices is radically different, and that therefore, even if its device falls within the letter of the claims, it is in spirit and essence so substantially different as to escape the charge of infringement. In the Kramer device, the wedge member acts as the intermediate part or wedge for both the vertical and the horizontal gripping action, while in the Ajax the member colored blue acts as the intermediate part or wedge for the vertical gripping action only, and the wedge *16* of the member colored red, which in Elfborg's specifications is termed the wedge member, performs that function in the horizontal gripping movement.

Many other, though less significant, differences are pointed out by the defendant. These result primarily from the differences just noted, or from modifications in form resorted to in order to save metal, and thus to produce a less costly and more available commercial device. The base of the member colored red of the Ajax is very short, and does not extend transversely beneath the entire length of the base of the other member. In the Kramer construction, flange *8* is caused to grip the rail base by a pushing or compressive force; in the Ajax, it is pulled over the edge of the rail base. The means by which the two members are mutually supported differ somewhat. Part *16* of the Ajax structure is a wedge and not simply, as in Kramer, a flange; Kramer's rib *10* is a wedge or part of a wedge, while defendant's is a flange. But this distinction is of no importance here for, whether a true wedge or not, each of these parts in both devices has a wedging surface and these surfaces in both devices co-operate in like manner to perform the same wedging function. Defendant's contention that the parts of the Ajax numbered *16* and *18* cannot be fairly assimilated to the correspondingly numbered flanges of the patent in suit, is not sustainable; the hook is duplex in form and clearly performs the double function of gripping the rail base and assisting in the horizontal wedging.

It is urged that these differences are vital when, because the advance in the art is gradual, proceeding step by step, each inventor is entitled at best only to the device which embodies his forward step and every inventor is entitled to his own specific structure, as long as it differs from and does not include that of his competitors. Railway Co. v. Sayles, 97 U. S. 554, 556, 24 L. Ed. 1053. Concededly, Kramer is not a pioneer; his invention is narrow and his patent is limited in scope; his is not the first double wedge rail anchor; but while single grip anchors had the two flanges, which engage the opposite edges of the rail base, on separate members, this improvement is not to be found in the prior double grip anchor.

Despite the differences noted, the Ajax anchor, in our judgment, not only responds to the claims in suit, but it embodies the basic conception which was Kramer's contribution to the art. The essence of his invention is a double grip anchor of two members—the one with a rail edge engaging flange, a base extending transversely beneath the

rail base for its entire width, and a tapering rib inclined horizontally; the other with a flange engaging the other edge of the rail and a flange engaging the inclined rib, thus affording the means by which the two members are drawn together. The function of his improvement over the prior art was to insure, not simply a firm and secure gripping of the edges of the rail, but a direct and effective support of the inner member on one side of the rail base, so as to enable that member to resist the strain of the downward pressure imposed upon it when its depending tie abutment is forced against the tie by the creeping of the rail.

The fundamental features of the Kramer patent are employed in the Ajax structure in order to secure the same objects. The latter not only responds literally to the Kramer claims, but it operates on the same general principles and is essentially similar in form, so far as form is material to obtain the results sought by Kramer. Transposition of parts without change of operation or function is of no importance. That the Ajax, by decreasing very considerably the amount of metal required without in any way altering the method of operation or the objects to be attained, represents a valuable improvement over Kramer, does not save it from the charge of infringement inasmuch as, despite the changes in form thereby secured, the structure is built upon and embodies Kramer's conception and contribution to the art.

The decree must be reversed, and the cause remanded for further proceedings in accordance with the views herein expressed.

### On Petition for Rehearing.

In a petition for rehearing, appellee again emphasizes the Wolfe patent and presents a new theory to demonstrate anticipation of the patent in suit and a new wooden model in support thereof. It is urged that, as the coacting surfaces of flanges $A^3$ and $B^5$, whose lengthwise tapering produces the vertical wedge action, also incline upwardly and inwardly conformably to the rail base, the wedge members, after being driven in far enough to grip vertically, on further pressure will move laterally along the rail base, thus producing a horizontal wedging action and averting the destruction of the anchor.

But, as Wolfe states in his specifications, when the wedge-shaped member is driven in so that the two members are firmly wedged together, "then the pin is inserted." In other words, further pressure, with the resulting transverse movement that could produce a horizontal grip, is not contemplated; it is to be avoided. And clearly, neither in his specifications nor in his drawings does Wolfe in any way allude to or disclose the possibility or desirability of such double wedge action. On the contrary, when he speaks of wedge shape or wedge action, he immediately defines it, and limits it to a longitudinal tapering or vertical wedging action. Figure 1 of his drawings, unlike the model offered, shows no clearance between the inner vertical edge of the base $A^1$ of member $A$, and the bottom of the inclined shoulder at the middle of the base of member $B$; as there shown, with the two members fitted on the rail base, any relative movement of them, transversely thereof, is blocked.

The successful argument of appellee's present solicitors in distinguishing Wolfe, when cited during the prosecution of the Elfborg patent, is persuasive against their present contentions. Moreover, neither claim 1 nor 3 of the patent in suit responds to the Wolfe patent; claim 3 specifies that each wedging action is produced by a different pair of wedging surfaces; claim 1 requires the base member to extend wholly beneath the rail base. Moore, No. 1,008,183, though later than the patent in suit, was applied for three months earlier. If it were the prior invention, claim 1 would be anticipated. We are satisfied, however, from the evidence, none of which was taken in open court, that priority of invention must be awarded to Kramer.

Sponenberg, No. 1,001,177, is a three, not a two, piece anchor; the wedging effect is differently produced. Moreover, neither he nor Player, No. 974,821, suggests the wedging action here in question. Neither of these patents is referred to in appellee's original brief.

The petition for rehearing will be denied.